# Illinois Official Reports

## Appellate Court

---

### *People v. Ramsey*, 2017 IL App (1st) 160977

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CEDRICK RAMSEY, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-16-0977 |
| Filed | August 22, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-20825; the Hon. Frank G. Zelesinski, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Christopher S. Carroll, of Aurora, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Joseph Alexander, and David J. Welch, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Presiding Justice Hyman and Justice Neville concurred in the judgment and opinion. |

# OPINION

¶ 1    After a bench trial, defendant Cedrick Ramsey was convicted of three counts of aggravated criminal sexual assault and sentenced to natural life in prison. He raises three issues on appeal: (i) whether the trial court erred in denying his motion to suppress evidence recovered during a warrantless search of his residence after police arrived in response to a 911 call, when the items were in plain view, were not taken by police during the initial search, and were later recovered by an evidence technician; (ii) whether the admission of other crimes evidence was an abuse of discretion; and (iii) whether his trial counsel was ineffective. Finding no error or other basis for reversal, we affirm.

¶ 2    Before trial, Ramsey filed a motion to suppress items recovered from and photographs taken inside his home. A transcript of the hearing on the motion is not included in the record on appeal. Ramsey argued that because there were no exigent circumstances, police were required to obtain a warrant to search his home after he was arrested. The State contended that officers responding to the 911 call had probable cause to enter the home in order to locate any victims or other offenders, particularly in light of Ramsey's admission that he had been fighting with his "girlfriend." Once inside the home, police saw in plain view a broken window, blood on the windowsill, and the items eventually recovered. Ramsey's motion to suppress was denied. Ramsey's motion to reconsider that ruling was likewise denied.

¶ 3    The State also moved *in limine* to admit other crimes evidence relating to Ramsey's sexual assault of two other young women. The other assaults were committed within a month of each other in 2000, and the current alleged assault occurred within two years of Ramsey's release from prison after he was convicted of those assaults. There were certain similarities in the method of attack, including Ramsey's conduct in luring women to his house for consensual sex and then attacking them once they arrived. The trial court determined that the other crimes evidence was admissible.

¶ 4    On May 31, 2008, Ramsey and the victim, F.S., a 17-year-old prostitute, initially spoke on a "chat line." Ramsey identified himself as "Dillon." F.S. agreed to meet Ramsey for sex in exchange for money that same day. They negotiated a price of $160 for half an hour.

¶ 5    Later that day, Ramsey, who was on electronic monitoring for another offense, went to pick up F.S. at 67th Street and Halsted Street. When Ramsey and F.S. arrived at Ramsey's home at 3 East 140th Court in Riverdale, Ramsey directed F.S. to the second floor. As they got to the top of the stairs, Ramsey placed his hand on F.S.'s shoulder, held a knife to her neck, and told her not to scream or he would kill her. Ramsey told F.S. to "get on the couch" in the bedroom and take off her clothes. After F.S. disrobed and while Ramsey still held the knife, he demanded that F.S. perform oral sex on him. Ramsey then tried but was unable to penetrate F.S.'s vagina. Ramsey had F.S. move to a bed in the room and lay facedown. Ramsey penetrated F.S.'s vagina with his penis but was unable to maintain an erection. Each time Ramsey lost his erection, he demanded that F.S. perform oral sex.

¶ 6    At one point, Ramsey told F.S. he was going to get some Vaseline. Before he left the room, Ramsey tied F.S.'s arms and legs behind her back with an exercise cord. When Ramsey returned, he rubbed some sort of lubricant on F.S.'s anus and then penetrated her vagina. Ramsey was interrupted by his phone ringing. He took F.S. to an exercise bench in the room and tied her to the bench with her hands behind her back and put a sock in her mouth so she could not scream. Ramsey dressed and left the room to return the phone call.

¶ 7    While Ramsey was out of the room, F.S. was able to free her hands. She then punched out a window in the room. When she could not escape through the window, she leaned out the window and called out for help. Ramsey then returned and pulled F.S. back into the room by her hair. As they struggled, Ramsey bit F.S.'s shoulder and punched her face and head several times.

¶ 8    Alphonzo Wells, Ramsey's next door neighbor, was outside washing his truck around noon that day. Wells heard the screams, saw a hand pull F.S. back into the house and called 911. Ramsey told F.S. to get dressed and to go wash the blood off her face because the police would be arriving soon.

¶ 9    Police spoke to Wells when they arrived a few minutes later, and Wells repeated what he had heard and seen. Ramsey met the police at his front door. According to responding officers, Ramsey was nervous and sweaty, and they noticed blood droplets on his T-shirt. Another officer noticed glass on the sidewalk under the broken window. Ramsey told the officers he had gotten into a fight with his girlfriend.

¶ 10   As Ramsey stood by the front door, other officers entered the home. F.S., crying, disheveled, and with scratches on her arms, ran down the stairs and toward the officers. Ramsey was placed under arrest, and F.S. was taken to the hospital by ambulance.

¶ 11   Officers walked through both floors of the residence to determine whether other perpetrators or victims were present. They checked closets, under the beds, and anywhere else a person could be hiding. There is no evidence that the officers opened drawers or otherwise searched in locations where a human being could not hide. In the second-floor bedroom, they noticed a knife and exercise equipment. The officers did not take any items at that time. About an hour later, an evidence technician entered the home and recovered the knife, an exercise cord, an audiovisual cord wrapped around a piece of exercise equipment, and a container of petroleum jelly. The technician also recovered a latex condom from the floor of the bedroom by the bed. The technician remained in the house for about 20 minutes, collecting the items in the bedroom and taking photographs.

¶ 12   At the hospital, F.S. recounted to nurse Nancy Healy the details of her assault. Healy observed abrasions and cuts on F.S.'s face and around her eyes; she had multiple scratches on the back of her upper right arm, and there were several lacerations on her upper and lower legs as well as a long laceration on her left hip. Healy also noticed a bite mark on the back of F.S.'s right shoulder. F.S. had abrasions on her genitalia consistent with forced penetration.

¶ 13   Healy collected swabs from F.S. as part of her examination. DNA testing of the swabs revealed a mixture of male and female DNA on F.S.'s underwear. DNA extracted from semen recovered from the underwear showed a mixture of at least three people, one of whom was F.S. Another was a male profile, but it could not be determined whether the third profile was male, and the result of the testing was inconclusive. DNA testing on a swab from F.S.'s breast revealed F.S.'s DNA and a male profile. A male DNA profile was also recovered from a swab of the bite mark on F.S.'s right shoulder. Both male DNA profiles recovered from the breast and shoulder swabs matched Ramsey's DNA profile.

¶ 14   Over Ramsey's objection, the court permitted testimony from another victim, S.S. Like F.S., S.S., then 16 years old, met Ramsey, who identified himself as "Shawn," on a chat line. S.S. made arrangements to meet "Shawn" on February 2, 2000. A person identifying himself as Shawn's brother picked her up and drove her to 3 East 140th Court in Riverdale. Once there, the man told S.S. he had a car for sale he wanted to show her and took her into a garage. As

they walked, the man placed a "pointy" object by her side, which she assumed was a knife. The man told S.S. to take off her clothes and forced her into the backseat of a car where he assaulted her. He continued to assault her as she leaned against the door of the car, forcing his penis partially into her vagina. The man then told S.S to get dressed. He put duct tape over her mouth and used it to tie her hands. He then put her in the trunk of the car. S.S. was eventually able to escape and ran screaming to a neighbor's house where police were called. An investigation resulted in Ramsey's arrest and conviction. Ramsey was sentenced to seven years and six months in prison on October 1, 2001.

¶ 15    Ramsey elected to testify. He recounted how he met F.S., or "Diamond," as she called herself, on the chat line and arranged to meet her for sex. Ramsey and F.S. agreed that Ramsey would pay her $160 for a half hour, including oral and vaginal sex, as well as bondage and other "fetishes." On the ride back to his residence, Ramsey received a call from the Illinois Department of Corrections (IDOC) because Ramsey was only permitted to leave his home for work or school, and neither was scheduled that day. Ramsey had intended to stop at an ATM after he picked up F.S. but was unable to because he received the call from IDOC. According to Ramsey, when they returned to his home, F.S. became impatient when Ramsey was put on hold for 10 or 15 minutes after he returned the call from IDOC.

¶ 16    Ramsey and F.S. eventually had consensual sex but were interrupted when Ramsey received a phone call from a friend. When he returned after taking the call, he had lost his erection and asked F.S. to perform oral sex again. She told him to "hurry up" because they had agreed on only one-half hour, and Ramsey told her to "forget it." F.S. then began demanding her money, and the two fought after Ramsey told her he had no money and could not drive her home because if he left his house again, he would be "violated." As they argued, a friend who Ramsey called to bring money to help pay F.S. and drive her home arrived, and Ramsey went out to meet him. He next heard the sound of glass breaking and heard F.S. yelling for help. Ramsey admitted hitting F.S. "a whole bunch of times" because she broke a window and placed "his entire freedom in jeopardy." After police arrived, Ramsey begged F.S. to tell them it was just a domestic disturbance and told her he would pay her if she agreed. Ramsey was arrested after he told police that he had been fighting with his girlfriend.

¶ 17    Ramsey denied ever being in possession of a knife or threatening F.S. with a knife. He admitted tying F.S. up with an exercise cord and then using an audiovisual cord because the exercise cord was too tight but claimed it was part of their agreement.

¶ 18    The court admitted certified copies of Ramsey's October 1, 2001, convictions for aggravated criminal sexual assault of S.S. and criminal sexual assault of another young woman.

¶ 19    In finding Ramsey guilty, the court found that F.S.'s account of the assault was corroborated by Wells's testimony recounting hearing the window break and F.S.'s screams for help. The court also found Ramsey's testimony unbelievable. Ramsey was sentenced to natural life in prison on two counts of aggravated criminal sexual assault. His motions for a new trial and to reconsider sentence were denied, and he timely appealed.

¶ 20    Ramsey first argues that the trial court erred in denying his motion to suppress the items recovered from his residence. Ramsey claims the police were unjustified in entering and searching the residence after he was arrested and an ambulance was called for F.S. He also contends that the delay in recovering the items, necessitating a second entry by the evidence technician, provides additional grounds for suppression.

¶ 21    We apply a two-part standard of review to a trial court's ruling on a motion to suppress. *People v. Almond*, 2015 IL 113817, ¶ 55. We will uphold the trial court's findings of fact and credibility determinations unless they are against the manifest weight of the evidence. *Id.* We review *de novo* the ultimate legal question as to whether the facts, as found by the trial court, warrant suppression. *Id.* In reviewing the propriety of a trial court's ruling on a motion to suppress, we may consider evidence adduced at the defendant's trial. *Id.*

¶ 22    Here, Ramsey has failed to include in the record on appeal the transcript of the December 6, 2011, hearing on his motion to suppress. There is likewise no transcript of the trial court's ruling on the motion. It is Ramsey's burden, as the appellant, to provide this court with a sufficiently complete record to allow for meaningful appellate review. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984); *People v. Urdiales*, 225 Ill. 2d 354, 419 (2007). We obviously cannot find that the trial court's factual findings are contrary to the manifest weight of the evidence when the evidence the court considered in denying the motion to suppress is not before us. This is particularly true given that two officers who testified at the suppression hearing did not testify at trial.

¶ 23    But, as noted, in determining whether the motion to suppress was properly granted, we may also consider testimony admitted at trial. What we do know from the trial testimony is that responding officers searched Ramsey's home after his arrest to look for other victims or perpetrators and that the physical evidence in plain view was not taken at that time but was later recovered by an evidence technician. Thus, based solely on these facts, we can decide *de novo* the legal issue as to whether the facts, as reflected in the record, warrant suppression.

¶ 24    The fourth amendment to the United States Constitution guarantees the right of citizens to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. As a general rule, warrantless searches are deemed unreasonable. *People v. Jones*, 215 Ill. 2d 261, 269 (2005). But exceptions to the warrant requirement exist, and the totality of the circumstances can render a warrantless search reasonable under the fourth amendment. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). One such exception is the emergency aid exception, which permits a warrantless entry into a home in emergency situations. *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 29. If officers believe it is necessary to enter a home "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," warrantless entry is permitted. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). As long as police have (i) reasonable grounds to believe an emergency exists and (ii) a reasonable basis "approximating probable cause" that the area searched is associated with the emergency, the warrant exception will apply. *People v. Ferral*, 397 Ill. App. 3d 697, 705 (2009). Evidence of a crime discovered during an emergency entry may also be seized without a warrant. *Id.* In particular, evidence in plain view may be seized during an emergency entry as long as police have probable cause to associate the evidence with criminal activity. *Jones*, 215 Ill. 2d at 271-72 (plain view doctrine allows police to seize an object without a warrant); *People v. Jackson*, 149 Ill. App. 3d 156, 159 (1986).

¶ 25    As applied here, the emergency aid exception justified the warrantless entry of Ramsey's residence, the search of the residence to locate other potential victims or offenders and the seizure of the evidence in plain view reasonably associated with Ramsey's assault of F.S. When police arrived in response to the 911 call from Wells, they spoke to Wells, saw broken glass on the ground under the second-floor window, and encountered Ramsey at his front door. Ramsey's appearance (nervous, sweaty, blood droplets on his T-shirt), as well as his

spontaneous statement that he and his girlfriend had just had a fight, gave police probable cause both to arrest Ramsey and enter the residence. Once inside, when officers saw F.S., crying and with cut marks on her arms, it was reasonable for them to walk through the entire residence to determine whether anyone else was present. There is no evidence that officers exceeded the scope of the permissible search by opening drawers or looking in, for example, kitchen cabinets. And once the officers saw items in plain view in the bedroom, which they reasonably believed were associated with Ramsey's assault on F.S. (a knife, cords, petroleum jelly, and a condom), they were justified in seizing those items.

¶ 26    Ramsey relies on a number of United States Supreme Court cases involving warrantless, postarrest searches of a defendant's home in which evidence was suppressed because police exceeded the permissible scope of the search. Citing *Mincey v. Arizona*, 437 U.S. 385 (1978), *Thompson v. Louisiana*, 469 U.S. 17 (1984), and *Flippo v. West Virginia*, 528 U.S. 11 (1999), Ramsey argues that once he was arrested and an ambulance was called for F.S., any emergency had passed. He contends that police needed a warrant to conduct a further search and to seize evidence located in the home, particularly when the evidence was retrieved, not by the officers who entered the home, but by an evidence technician an hour later.

¶ 27    The United States Supreme Court cases relied on by Ramsey are readily distinguishable. In each, police conducted an exhaustive warrantless search of a defendant's residence after entering in response to an emergency. For example, in *Mincey*, the warrantless search lasted for several days while police conducted an exhaustive search of defendant's residence for potential evidence in connection with the murder of an undercover police officer. 437 U.S. at 389, 393, 395. See also *Thompson*, 469 U.S. at 19-21 (police investigating murder and attempted suicide searched defendant's home for two hours after entering and recovered evidence that was not in plain view); *Flippo*, 528 U.S. at 12 (police processed defendant's home for over 16 hours after his wife was found murdered). In contrast, when police entered Ramsey's home and encountered F.S., it was eminently reasonable for them to walk through the residence to determine if anyone else was present. And when during that permissible search they saw items in plain view in the bedroom where the attack occurred, which obviously related to the attack, they were entitled to seize that evidence, again without a warrant.

¶ 28    Courts have recognized that if seizure is justified under the plain view doctrine, the fact that the ultimate recovery of the evidence is accomplished not by the officer who first saw the evidence, but by another member of law enforcement, does not invalidate the seizure. See *People v. Drummond*, 103 Ill. App. 3d 621, 625 (1981) (warrantless search of defendant's vehicle by officers after defendant's arrest and transport of vehicle to police parking lot permissible); see also *Clark v. United States*, 593 A.2d 186, 188 (D.C. 1991) ("A holding that even though [the officer who first saw the evidence in plain view] had the right to seize the pistol, clip and slug and to photograph the scene, [the evidence technician] acted unlawfully in doing so would improvidently exalt form over substance."); *State v. Bell*, 737 P.2d 254, 259 (Wash. 1987) ("[o]nce the privacy of the residence has been lawfully invaded, it is senseless to require a warrant for others to enter and complete what those already on the scene would be justified in doing"); *Smith v. State*, 419 So. 2d 563, 572 (Miss. 1982) (refusing to grant suppression where evidence seized by evidence technician as opposed to first officer who saw it).

¶ 29    Thus, because police properly entered Ramsey's residence and conducted a limited search necessary to determine the presence of others and because the evidence ultimately recovered

- 6 -

by an evidence technician was in plain view and its relation to the crime was readily apparent, the trial court properly denied Ramsey's motion to suppress.

¶ 30     Ramsey next argues that the trial court improperly allowed the State to admit other crimes evidence in the form of testimony from S.S., another of Ramsey's victims. Although Ramsey concedes that other crimes evidence is admissible by statute in sexual assault cases (725 ILCS 5/115-7.3 (West 2008)), he contends that the probative value of this evidence was greatly outweighed by its prejudicial effect.

¶ 31     It is well settled that the admission of evidence is a matter committed to the trial court's discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). A trial court's decision to admit evidence will not be deemed an abuse of discretion unless the ruling is arbitrary or one with which no reasonable person would agree. *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 32     Under section 115-7.3 of the Code of Criminal Procedure, the legislature has determined that when a defendant is accused of certain sex offenses, including aggravated criminal sexual assault, evidence of defendant's commission of other enumerated offenses may be admissible and "may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(a), (b) (West 2008). Generally, other crimes evidence may be admitted if it tends to show intent, *modus operandi*, identity, motive, absence of mistake, and any material fact other than propensity. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). But under section 115-7.3, it may also be admitted to show propensity to commit certain sex offenses. *Id.* at 176; *People v. Boyd*, 366 Ill. App. 3d 84, 93 (2006). Section 115-7.3(c) provides that a court may consider, among other relevant facts and circumstances, the temporal proximity and the degree of similarity between the charged offense and the other crime, to determine whether the probative value of the evidence exceeds any undue prejudice to defendant. 725 ILCS 5/115-7.3(c) (West 2008). "As factual similarities increase, so does the relevance, or probative value, of the other-crime evidence." *Boyd*, 366 Ill. App. 3d at 93.

¶ 33     The trial court did not abuse its discretion in allowing S.S. to testify to Ramsey's assault on her. Both cases share several similarities, including Ramsey using an alias on a chat line, initiating consensual sex with young women, bringing them to his home, threatening them with a knife, forcing them to engage in sex, and tying them up. Given that Ramsey's attack on F.S. was less than two years after his release from prison on the charges stemming from his attack on S.S., the temporal proximity of the attacks also supported the admission of this evidence. Although the evidence was undeniably prejudicial, we cannot say that the trial court abused its discretion in determining that its probative value outweighed its prejudicial effect. Consequently, the admission of other crimes evidence provides no basis for reversal.

¶ 34     Finally, Ramsey claims that his trial counsel's performance was deficient in a number of respects, including counsel's failure to object to leading questions asked of F.S. during her direct examination, his inability to impeach F.S. with the contents of a statement she gave to police, the withdrawal of a motion to suppress statements Ramsey made to police, and his elicitation of testimony from Ramsey that supplied a missing element of the State's case. He argues that his attorney's substandard performance deprived him of the effective assistance of counsel.

¶ 35     When a defendant claims he received ineffective assistance of counsel, he must show that " 'his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.' " *People v. Simpson*, 2015 IL 116512, ¶ 35 (quoting *People v.*

*Patterson*, 192 Ill. 2d 93, 107 (2000)); *Strickland v. Washington*, 466 U.S. 668, 695 (1984). Our review of claimed deficiencies in trial counsel's performance is "highly deferential" (*People v. Perry*, 224 Ill. 2d 312, 344 (2007)), and we generally presume that counsel's trial decisions are the product of " 'sound trial strategy.' " *People v. Manning*, 241 Ill. 2d 319, 327 (2011) (quoting *People v. Smith*, 195 Ill. 2d 179, 188 (2000)); see also *People v. Wood*, 2014 IL App (1st) 121408, ¶ 61. The guarantee of effective assistance of counsel is fulfilled by competent, not perfect representation. *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 52.

¶ 36    Ramsey claims his lawyer failed to object to leading questions asked of F.S. on direct examination and was unable to impeach F.S. with the content of her statement to police. "As a general rule, trial strategy encompasses decisions such as what matters to object to and when to object." *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991); see also *People v. Perry*, 224 Ill. 2d 312, 344 (2007). We have carefully examined the entirety of F.S.'s testimony, and appellate counsel's characterization is not borne out by the record. While F.S. was asked some leading questions on direct, she gave detailed narrative answers regarding the attack. Regarding counsel's attempt to impeach F.S., it appears that counsel was attempting to elicit from F.S. that her written statement did not include the details that she told Ramsey to stop during the attack or that she "withdrew" her consent to have sex with him. No copy of F.S.'s statement is included in the record so it is impossible for us to determine the precise nature of the evidence counsel was attempting to adduce. And although defense counsel informed the court that he intended to subpoena a witness to prove up the contents of F.S.'s statement, he never did so, leading us to conclude that the "impeachment," if it existed, was insignificant. Given the overwhelming evidence of Ramsey's guilt, it is evident that even if we assume F.S. did not tell the police that she asked Ramsey to stop or "withdrew" her consent, such evidence would have had absolutely no impact on the outcome. *People v. McCarter*, 385 Ill. App. 3d 919, 927 (2008) (rejecting ineffective assistance claim where "some of the complained-of evidence was introduced in error, [but] the remaining admissible evidence against defendant was so strong that no prejudice resulted to him from the error"); see also *People v. Cherry*, 2016 IL 118728, ¶ 31 ("[T]o prevail on an ineffective assistance claim under *Strickland*, a defendant must establish both prongs of the *Strickland* test, such that the failure to establish either precludes a finding of ineffective assistance of counsel.").

¶ 37    Regarding his own testimony, Ramsey claims that his lawyer elicited testimony that he penetrated F.S. when there was "no physical evidence of penetration" introduced in the State's case. First, F.S. testified to penetration, and if the trial judge believed her testimony, as he evidently did, it was sufficient to establish this element of aggravated criminal sexual assault. See *People v. Le*, 346 Ill. App. 3d 41, 50-51 (2004) (victim's testimony does not need to be corroborated by physical evidence to sustain conviction for criminal sexual assault) (citing *People v. Morrow*, 104 Ill. App. 3d 995 (1982) (unequivocal testimony of complainants was sufficient to sustain rape conviction, even without corroborating physical evidence)). Second, Ramsey admitted to having intercourse with F.S. for "a couple of minutes" not in response to a question from his lawyer but on cross-examination by the State's Attorney. Having elected to testify, Ramsey cannot complain about the questions he was required to answer on cross-examination.

¶ 38    Ramsey further claims his lawyer unnecessarily elicited testimony from a State witness regarding the condom found on the floor of the bedroom. Yet Ramsey's defense was based on his claim that he and F.S. had consensual sex, which the use of a condom would inferentially

support, and in his own testimony, Ramsey volunteered that he attempted to put on a condom but was unable to.

¶ 39 The last witness that is the subject of Ramsey's ineffective assistance claim is S.S. Ramsey contends his lawyer asked a question of S.S. on cross-examination that presumed Ramsey was her attacker, when during her direct testimony she never named Ramsey nor was she asked to identify him in court as the man who attacked her 14 years earlier. But the State called a witness who confirmed that Ramsey was the person convicted of the attack on S.S. and introduced a certified copy of Ramsey's conviction, so counsel's question was of no consequence.

¶ 40 Ramsey also claims that his lawyer was ineffective for failing to pursue a motion to suppress statements Ramsey made to police after he was arrested. A written motion contained in the record seeks suppression on the ground that Ramsey's statements were the product of promises by police that Ramsey would only be charged with domestic battery and released that night. The motion was filed by an attorney other than the attorney who represented Ramsey at trial. Ramsey makes no argument about the likelihood that the motion would have been granted nor does he articulate, given all of the other evidence against him, how the outcome of the trial would have been affected if his statements had been suppressed. An attorney's decision to pursue a motion to suppress is a matter of trial strategy that we will not second-guess. *People v. Bew*, 228 Ill. 2d 122, 128 (2008); *People v. Jones*, 371 Ill. App. 3d 303, 307-08 (2007) (rejecting ineffective assistance claim where defendant failed to overcome "the strong presumption that his counsel's failure to file a motion to suppress was the result of trial strategy"). Given counsel's pursuit of the motion to suppress evidence and his vigorous defense of Ramsey at trial, we must presume that his decision to withdraw the motion to suppress statements filed by another lawyer was sound trial strategy. As such, it cannot support Ramsey's ineffective assistance claim.

¶ 41 The judgment of the circuit court of Cook County is, therefore, affirmed.

¶ 42 Affirmed.