NOTICE

Decision filed 10/18/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220664-U

NO. 5-22-0664

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* B.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Christian County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-JA-6 |
| | ) | |
| Joseph C., | ) | Honorable |
| | ) | Jeffrey A. DeLong, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1　*Held*: Respondent did not receive ineffective assistance from his trial counsel, and therefore, the circuit court's finding of unfitness and order terminating respondent's parental rights are affirmed.

¶ 2　Respondent, Joseph C., appeals the Christian County circuit court's finding of unfitness and order terminating his parental rights, arguing that his trial counsel provided ineffective assistance of counsel at the fitness hearing. For the following reasons, we affirm.

1

¶ 3                            I. BACKGROUND

¶ 4      Courtney C. is the wife of Joseph C. and the biological mother of two children, N.R., born

September 5, 2014, and M.R., born March 7, 2012.[1] Joseph C. is not the biological father of those

children. On March 22, 2018, the Illinois Department of Children and Family Services (DCFS)

received a hotline call stating that Joseph was a registered sex offender due to a prior conviction

for child pornography and was residing with Courtney, N.R., and M.R. The reporter stated that

Courtney did not believe Joseph's presence was an issue for the children. Courtney believed Joseph

was innocent and would not harm the girls. DCFS received a second hotline call on April 24, 2018.

At that time, the reporter expressed concern that Joseph was on school district property with

Courtney while she was dropping off the girls. DCFS notified the Greenville Police Department.

M.R. and N.R. later reported to DCFS that Joseph stuck his fingers in N.R.'s buttocks and told her

to poop. Courtney disputed M.R. and N.R.'s allegations and stated she did not believe Joseph was

a predator. DCFS took custody of M.R. and N.R.

¶ 5      B.C., whose biological parents are Courtney and Joseph, was born on January 21, 2019.

B.C. was taken into custody following her birth due to the pending DCFS case involving her

siblings. On January 24, 2019, the State filed a petition for adjudication of wardship alleging two

counts of neglect. The first count alleged that B.C.'s environment was injurious because Courtney

was involved in two pending juvenile cases involving B.C.'s siblings who were previously found

neglected, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act)

(705 ILCS 405/2-3(1)(b) (West 2018)). The allegation was based on Courtney allowing Joseph, a

sex offender, to have access to the children after he was indicated for sexual penetration against

_____

        [1]Neither Courtney nor the children M.R. and N.R. are parties to this appeal, and they will only be
discussed as necessary to provide relevant background for this case.

one of the minor's siblings. Count II alleged that B.C. was neglected because Courtney was still living with and married to Joseph, had not completed her current service plan in the other cases, and was only receiving supervised visitation with B.C.'s siblings.

¶ 6 A shelter care hearing was held on January 28, 2019, at which time counsel was appointed for each parent, a guardian *ad litem* (GAL) was appointed for B.C., and both parents consented to B.C.'s placement in shelter care. The adjudicatory hearing was scheduled for June 26, 2019. However, at that time, Joseph was incarcerated in the Bond County jail. His counsel advised the court that Joseph's probation had been revoked and the hearing was continued.

¶ 7 The adjudicatory hearing was held on August 21, 2019. Both parents stipulated that the State could prove the allegations in count I of the petition for wardship and the State agreed to dismiss count II. In order to confirm the parties' stipulation, the court required the State to provide a factual statement as to the evidence that would have been presented. The State's factual statement indicated that testimony would be provided regarding Joseph's status as a registered sex offender, his residence in the home with B.C.'s siblings, and that DCFS determined, after March 22, 2018, that Joseph sexually penetrated one of those children based on the allegations raised by both children. Following the State's recitation, the parents agreed the State had sufficient evidence to prove the allegations in count I but denied the actions stated therein. The court found the stipulations were knowing and voluntary and that sufficient facts were presented to show that B.C. was neglected. The court set the dispositional hearing in 30 days and ordered DCFS to file a written report 3 days before the hearing.

¶ 8 The dispositional hearing was held on September 18, 2019. The agency report, which was not timely filed but was circulated prior to the hearing, listed Joseph's service plan as requiring completion of a sexual perpetrator evaluation and following all recommendations stemming from

3

the evaluation. The report stated Joseph had not yet completed the assessment. The report also recommended setting a goal of return home in five months and granting custody and guardianship to DCFS. Both parents consented to the report's dispositional request, and thereafter, the court awarded custody and guardianship to DCFS with a return home goal in five months. A permanency hearing was scheduled for December 18, 2019.

¶ 9 On December 18, 2019, Joseph's attorney indicated that an arrest warrant was issued for Joseph in Bond County. The case was rescheduled for January 29, 2020.

¶ 10 The agency's permanency report was filed on January 13, 2020. The report included text messages between the caseworker and Joseph on December 19, 2019, in which Joseph accused the caseworker of lying on the witness stand and threatened to press charges against the worker. A later text exchange addressed B.C.'s availability to visit Joseph's family for Christmas. When Joseph was advised that supervised visitation was required, Joseph's texts revealed increased animosity toward the caseworker and anger regarding the agency's holiday arrangements. Joseph's texts became more animated after the caseworker disengaged from responding.

¶ 11 The permanency report indicated that Joseph's text messages related to the Christmas visitation continued on December 20, 2019, and were equally, or more, aggressive and profanity-laden with each communication. On December 23, 2019, Joseph left two profanity-laden, insulting, and threatening voicemails. The agency program director issued a "critical decision" stating the "agency has decided not to continue to offer a visit to [Joseph] this week" due to his "derogatory language and threatening statements." On December 24, 2019, Joseph's antagonistic and profanity-laden voicemails and text messages continued. When no responses were provided, he proceeded to call the caseworker obscene names. The agency was advised by the foster parent on December 24, 2019, that Courtney told B.C. during her supervised visitation that "Mommy is

4

going to go to Tiffany's[2] house while she is sleeping and kill her and her family." Joseph sent additional threatening and profanity-laden texts on December 30, 2019, and January 1, 2020.

¶ 12    The report further indicated that on January 6, 2020, Joseph was arrested in Courtney's home on the outstanding warrant issued while he was having visitation with B.C. Prior to the arrest, Joseph asked the caseworker to lie and state he was not in the home. The caseworker refused and Joseph was arrested.

¶ 13    A permanency review hearing was held on January 29, 2020. Joseph's counsel advised the court that Joseph was now in prison.

¶ 14    The July 22, 2020, permanency report revealed that Joseph was sentenced to 3½ years in the Illinois Department of Corrections (IDOC) and was incarcerated at Graham Correctional Facility. The report noted that although Joseph had numerous conversations with Courtney, he had not reached out to the agency regarding his potential to complete services while incarcerated. He had not received visitation since his incarceration due to COVID. The report further noted that legal screening was being completed due to the parents' lack of progress. The history confirmed that Joseph was previously convicted of child pornography and completed his 22-month sentence for that conviction in IDOC. The permanency hearing on July 29, 2020, was continued due to Joseph's nonappearance due to his incarceration.

¶ 15    The permanency reports from September 11, 2020, to the end of 2020 revealed that Joseph participated in no services and visitation never occurred between Joseph and B.C. while Joseph was incarcerated. While Joseph requested video visitation in December 2020, the prison staff advised DCFS that it was not authorizing the visitation due to B.C.'s age. Other relevant entries in the permanency reports indicated that by November 19, 2020, Courtney ceased contact with

_____

[2]Tiffany was the caseworker.

Joseph, who sent her letters that started off nice and then turned mean and finally ended with Joseph threatening the father of Courtney's older children.

¶ 16    A permanency review hearing was held on January 21, 2021. Joseph remained incarcerated. The parties addressed the sexual offender evaluation performed as part of Joseph's probation. After numerous comments misconstrued Joseph's most recent conviction, the court clarified that Joseph's current sentence was based on the violation of "child sex offender residing 500 feet within a park." The court stated that Joseph was placed on probation in November 2018 and then probation was revoked based on other allegations which led to his current three years in IDOC. The court asked Joseph if any of the stated information was incorrect and Joseph replied, "Nope." The parties indicated that they would try to obtain the records from the November 2018 sex offender evaluation.

¶ 17    All of the permanency reports filed in 2021 revealed that Joseph failed to complete any services and received no visitation while he was incarcerated. The reports continued to express concern for Courtney and B.C.'s safety when Joseph was released from prison in December 2021.

¶ 18    The DCFS family service plan was filed on December 2, 2021. The report noted that Joseph's prior sexual perpetrator evaluation diagnosed him with "other specific paraphilic disorder." The report found Joseph's progress—on the recommendations stemming from the sexual perpetrator evaluation—was unsatisfactory due to him twice being discharged from services. The agency requested a new assessment due to the passage of time and added a new service requirement consisting of compliance with his probation requirements.

¶ 19    The March 2, 2022, permanency report revealed that Joseph was released from prison, but the agency had no knowledge of his compliance because he had not signed a consent that would allow the agency to speak with his probation officer. The agency again requested an updated sexual

perpetrator evaluation. The caseworker was finally able to contact Joseph on February 15, 2022, and tried to set up a meeting with him and his attorney to discuss the suspended visitation. The agency requested a petition to terminate parental rights.

¶ 20    The March 28, 2022, permanency hearing report indicated the agency still had not received the consent to contact Joseph's probation officer. Joseph contacted the caseworker on March 9, 2022, requesting visitation with B.C. and the caseworker again requested Joseph and his attorney set up a meeting date to discuss the suspension of Joseph's visitation. As of the date of the report, no meeting was scheduled. The agency continued to recommend filing a petition to terminate parental rights.

¶ 21    Courtney's parenting capacity assessment report was filed on March 28, 2022. The report indicated that Courtney continued to express concern that DCFS might allow Joseph to have contact with B.C. and her fears that Joseph would sexually abuse B.C. Courtney was currently using a post office box so Joseph would not know her address and expressed interest in obtaining an order of protection. Courtney was concerned that if Joseph knew her address, he might be dangerous to her. She stated that she believed Joseph "would physically harm her [but] probably not kill her."

¶ 22    On March 29, 2022, the State filed a petition to terminate parental rights and for appointment of guardian with power to consent to adoption. The petition alleged that Joseph was an unfit person because he failed to maintain a reasonable degree of interest, concern, or responsibility pursuant to section 2-3 of the Juvenile Court Act (705 ILCS 405/2-3 (West 2022)).

¶ 23    A permanency hearing was held on March 30, 2022, to address the proposed goal change to substitute care pending termination. Joseph contested the change and the State called Savannah Herald, the caseworker, to testify. She testified that she mailed Joseph a copy of his service plan

7

while he was incarcerated and tried to contact him following his release. He eventually contacted her and provided his contact information. She was last in contact with Joseph on March 9, 2022. She testified about Joseph's services, stating that he completed the sexual perpetrator evaluation but failed to follow the recommendations, as he was discharged from treatment twice. His other service involved compliance with probation, which she was unable to confirm because Joseph had not signed a consent allowing her to communicate with his probation officer.

¶ 24    Chelsey Leclair testified that she was a caseworker supervisor and came into the case in January 2021. She provided a foundation for the report and no further questions were asked.

¶ 25    Following argument, the court noted Joseph's lack of progress. While noting that Joseph was incarcerated, the court stated that did not mean Joseph could not make efforts or progress while incarcerated. The court noted Joseph was released four months earlier and still had not signed a release for the agency to communicate with his parole officer. Thereafter, the court changed the goal to substitute care pending determination of termination of parental rights as to Joseph after finding no reasonable substantial progress.

¶ 26    On April 1, 2022, the State filed a supplemental petition to terminate alleging two counts. The first count remained a failure to maintain a reasonable degree of interest, concern, or responsibility. The second count alleged Joseph was depraved based on three previous felony convictions with at least one of the prior convictions taking place within five years of the filing of the petition to terminate parental rights.

¶ 27    On April 26, 2022, Caritas Family Solutions filed a termination hearing report. The report stated the caseworker sent, via email and U.S. mail, a consent to Joseph to allow the worker to speak with his probation officer. The mail version included a return envelope. A follow-up email was sent by the supervisor on April 20, 2022. No consent was returned. The report stated that

8

visitation was inappropriate given B.C.'s age while Joseph was incarcerated, and the agency believed it was not in B.C.'s best interest to visit him in a prison setting. Since then, B.C. was diagnosed with separation anxiety. A critical decision was made on January 14, 2022, to suspend visitation between Joseph and B.C. until Joseph and his attorney met with the agency. The agency recommended termination of Joseph's parental rights.

¶ 28 On May 4, 2022, a first appearance hearing on the termination petition hearing was held. Joseph failed to appear and was found in default. The court set the matter for first appearance, unfitness, and possibly best interest on May 25, 2022.

¶ 29 On May 24, 2022, a termination hearing report was filed. The consent allowing the caseworker to speak with Joseph's probation officer was still not returned. Visitation had still not occurred as Joseph and his attorney had not met with the agency.

¶ 30 On May 25, 2022, all the parties appeared except Joseph. The State indicated it was ready to proceed. Joseph's counsel asked for a continuance. Counsel stated that he called his client's number, but it was disconnected. Neither East St. Louis parole nor Effingham County had any contact information for him. The State and the GAL objected to the motion. Courtney's counsel took no position. The court denied the motion to continue, stating Joseph did not appear on May 5, 2022, or March 25, 2022. His attorney then presented a notice issue claiming the State's amended petition did not reveal whether it was properly served. The State indicated that summons was issued for both petitions and the burden was on Joseph to show that service was not made. The GAL expressed concern of having to do everything over if service was improper. The court ultimately granted the motion to continue and scheduled the unfitness hearing for July 6, 2022.

¶ 31 On July 25, 2022, a termination hearing report was filed. The report revealed that Joseph self-reported on July 9, 2022, that he made an appointment with Alternatives Counseling to

9

complete an updated assessment on August 2, 2022. The consent to communicate with his probation officer was not received, and no visitation had occurred.

¶ 32    On August 3, 2022, the parties presented for the fitness hearing. The State called Savannah Herald who testified that she was assigned as the caseworker on March 9, 2021. She explained why B.C. was brought into care and that the service plan was already in force when she took over the case. She testified as to Joseph's service plan and stated Joseph had not completed the classes recommended following the sex offender assessment. Joseph initially had supervised visitation with B.C. and last participated on January 6, 2020. Thereafter, he was incarcerated. She further testified that after Joseph's release, a critical decision was made to terminate visitation on January 14, 2022, because Joseph had not seen the child in over two years and there was no relationship or bond. Her office tried to schedule a meeting with Joseph and his attorney to discuss visitation, but no meeting was ever set. She stated the scheduling issues were not due to the agency. Ms. Herald was unaware of any cards, letters, or gifts sent by Joseph to B.C. while he was incarcerated or following his release. When Joseph was incarcerated, Ms. Herald sent him his service plan on October 5, 2021, with a letter inviting him to the administrative case review (ACR) meeting with the agency that also discussed what was expected of him for his services. He participated in the meeting on October 18, 2021. She sent a referral to Joseph after his incarceration for alternative counseling for him to get engaged in that evaluation and services. The correction facility, where Joseph was housed, offered sex offender treatment, and Joseph would have had to place himself on the waiting list for the class. Ms. Herald stated that she sent Joseph a letter telling him to get on the waiting list.

¶ 33    She did not know how long the waiting list was or if he got on it. She stated that from January 2022 to the present, Joseph made one attempt to have visitation with B.C. The caseworker

10

believed she had done everything possible for reunification and stated that the parents' completion of services was a factor and visitation was not necessary for reunification. She disputed that her agency did not provide Joseph with an opportunity to visit his daughter, stating there were visitations before he was incarcerated. Ms. Herald confirmed that the parent was required to supply the agency with any completion of or attempts to complete the service plan requirements. Joseph never provided anything.

¶ 34 Following Ms. Herald's testimony, the State moved to submit copies of Joseph's certified convictions. Joseph's attorney objected, stating the documents, in the manner presented, did not qualify as business records and/or a true and accurate representation of a certified conviction. In response, the State stated that the evidence rule did not require any kind of raised stamp. It further argued that as long as the record was certified by the person authorizing it, it complied with the rule. The State indicated that the documents at issue were certified by the clerk of Bond County and notarized. The State averred that the convictions were requested as a group and the clerk certified them as a group. The court expressed concern about the grouping. Although no formal rejection of the documents was presented, the State moved to call Joseph as an adverse witness.

¶ 35 Joseph testified that he was convicted of unlawful residency of child sex offender, and when asked if he was convicted of that charge in November 2020, he stated, "I guess so. I don't know." He agreed that he was convicted of child pornography but stated he did not know the date of the conviction. He further admitted that he was convicted of violation of an order of protection, which was also a felony, but he did not know if he was convicted of a second violation of an order of protection. Cross-examination by Courtney's attorney revealed that Joseph did not know how many felony convictions he had. He stated he had more than three but did not know if he had more than five. He was last in IDOC two or three years earlier and was sent to IDOC three times. All of

11

his IDOC incarcerations were in the last 12 or 13 years. The State rested and no witnesses were called by Joseph's attorney.

¶ 36    The State argued that it met the burden for depravity since Joseph admitted having three felonies, one of which was in the last five years since he was charged with unlawful residency of a child sex offender in 2018. The State further argued that Joseph failed to rebut the presumption of unfitness as no evidence was presented. Joseph's attorney argued that the State failed to put in certified copies of the convictions, failed to meet its burden, and there was no evidence to show that Joseph would not be a good father. Joseph's counsel further argued that the agency did nothing in terms of providing Joseph with an opportunity to be reunited with his daughter.

¶ 37    Following arguments, the court found insufficient evidence of a lack of reasonable interest alleged in count I. As to count II, the court stated that Joseph's testimony of convictions for unlawful residency of a criminal sex offender, possession of child pornography, and violation of an order of protection confirmed the felony status of the convictions. The court also noted that the unlawful residency conviction would have to fall within the five-year requirement based on the charges being filed in 2018. The court noted that the cross-examination testimony further confirmed at least three felonies and that Joseph was in IDOC at least three separate times in the last 12 years. The court found there was no testimony to rebut the presumption of depravity, and therefore, the court found unfitness based on depravity and set the matter for a best interest hearing on September 7, 2022.

¶ 38    On August 26, 2022, a best interest report was filed, stating that B.C. was bonded with the foster parent who provided care since January 24, 2019. B.C. loved living in the home and being with her foster parent. Her medical, emotional, and physical needs were met, and she was always dressed appropriately. B.C. had two half-sisters that she visited often. She was too young to express

her wishes. The agency recommended B.C. remain in her current placement and that Joseph's parental rights be terminated.

¶ 39    On September 7, 2022, the best interest hearing was held. Caseworker Herald testified as did the foster mother. Ms. Herald testified that she had observed the interactions between B.C. and her foster parent and, in her opinion, B.C. was bonded to the foster parent. B.C. had been with the same foster parent since the case began, when she was only a few days old, and the foster parent was a relative. Her medical, physical, and emotional needs were met by the foster parent. The foster parent was willing to provide permanency. B.C. had her own room at the house and was bonded with the foster mother's oldest daughter, who also lived in the home.

¶ 40    On cross-examination, Ms. Herald stated that Joseph's visitation was suspended while she was the caseworker. She stated that there was an opportunity to establish a connection prior to his incarceration. She agreed that Joseph had no contact with the minor for over two years. Joseph last had visitation on January 6, 2020, and was arrested on that visit. She stated that Joseph was released from prison in December, approximately eight months earlier. Visitation was immediately suspended due to the fact that he had not done his services and B.C. had not seen her father. She stated that Joseph was provided an opportunity to come to the agency and sit down with her and the supervisor; however, no meeting was set up because his attorney did not get back to the agency with date and times to meet. Ms. Herald disagreed that the agency was punishing Joseph because his attorney did not respond to an email. She agreed the attorney's presence was not required but wanted the attorney there in case Joseph had any questions or concerns. She stated that eventually, after the last court hearing, all of them sat down and talked. She stated that attempts at reunification were made while he was incarcerated, including invitations to the ACR meetings which were used to discuss what Joseph needed to do to reunify with his child. Joseph participated by calling in.

Joseph's attorney inquired as to whether only one attempt was made, and the court reminded counsel this was the best interest hearing, not the fitness hearing. After counsel argued his point about the agency not providing an opportunity for his client to bond with his child, no further questions were asked. The GAL asked Ms. Herald if there had been any ACRs this year and she said there were. Joseph was given notice but did not attend. On recross by Joseph's attorney, Ms. Herald stated the notice was provided by email and had a copy of the email with her. No further questions were asked.

¶ 41    The foster parent testified that B.C. had been with her since birth and was now 3½ years old. She confirmed the bond between B.C. and her oldest daughter. B.C. had her own room and was going to preschool. B.C. had a little bit of separation anxiety going to school, but the teacher said she did well once she got there. The foster parent took B.C. to the doctor when she needed to go. She got a physical to start school. She was willing to provide permanency. She loved B.C. On cross-examination, the foster parent stated that Joseph had supervised visits with B.C. prior to his incarceration. She further stated that at no point did she take B.C., nor was she asked by the agency to take B.C., to the IDOC facility where Joseph was housed. She did not know if Joseph was provided with a Zoom opportunity or video conferencing with B.C. while he was incarcerated but stated she would have been willing to do Zoom. The foster parent stated Joseph was at the hospital when B.C. was born and was with her thereafter. Joseph had supervised visits. She did not know if there was a bond because she did not supervise the visits between Joseph and B.C. She had no concerns about her ability to take care of the minor child. She understood that she could be financially responsible for the child until she reached 18. Thereafter, the State rested. None of the other parties called any witnesses.

14

¶ 42	Joseph's counsel argued that his client never had an opportunity to maintain a relationship with the child. The State and the GAL argued that Joseph's rights should be terminated. Courtney's counsel agreed and was asked, by the court, the status of Courtney. Her counsel advised the court that she signed a consent to guardianship. Joseph's counsel asked to be heard and stated:

> "One of the biggest things that I'm concerned about, this is maternal grandmother, mom has the opportunity to receive the guardianship. Mom is always going to be in this child's life and because of their dislike of dad, dad didn't get that opportunity. So, I do want to preserve that for any appeal issues, but that is how it comes across. Even if dad would get guardianship, the likelihood of *** him seeing this minor [is] very, very small. However, this is a perfect opportunity for mom to still be in this child's life and dad not getting the opportunity to do so."

The caseworker provided a copy of the signed guardianship to the court and the court took a recess.

¶ 43	Following the recess, the court returned the paper and stated it believed that was "a factor that needs to be considered in the best interest determination." After considering the factors in the definition of section 1-3 of the Juvenile Court Act (705 ILCS 405/1-3 (West 2022)), the court found it was in the best interest of B.C. to terminate Joseph's parental rights. A written order terminating father's parental rights was filed on September 19, 2022. Joseph timely appealed.

¶ 44	II. ANALYSIS

¶ 45	Before we address the merits of this appeal, we find it appropriate to first discuss the timing of our decision. This case involved an accelerated appeal pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Section (a)(5) of that rule requires this court to issue our decision 150 days after the filing of the notice of appeal, except where good cause is shown. Ill. S. Ct. R.

15

311(a)(5) (eff. July 1, 2018). The notice of appeal was filed on October 3, 2022, rendering our decision due by March 6, 2023.

¶ 46    This case was not ready for review and received by this panel until it was placed on the October 24, 2023, docket. After Joseph filed his notice of appeal, he was appointed counsel who filed a motion to withdraw as counsel, pursuant to *Anders v. California*, 386 U.S. 738 (1967), on February 2, 2023. The motion alleged that appellate counsel found nothing in his review that would support an appeal. On February 16, 2023, this court noted the lack of a supporting memorandum as required by *Anders* and granted counsel 14 days to file an *Anders* brief in support of his motion to withdraw. On March 2, 2023, counsel filed a memorandum listing four potential issues with unmeritorious arguments. On March 8, 2023, this court issued an order allowing Joseph until April 19, 2023, to file a response as to why the appeal should not be dismissed. None was filed.

¶ 47    On May 8, 2023, this court issued an order directing appellate counsel to file a supplemental memorandum in support of the motion to withdraw addressing whether Joseph's trial counsel was ineffective setting forth three specific issues for consideration. Appellate counsel filed the supplemental memorandum on May 30, 2023. On June 14, 2023, this court issued an order denying appellate counsel's motion to withdraw pursuant to *Anders* and ordered counsel to file his appellant's brief within 35 days. On July 20, 2023, appellate counsel moved for additional time to prepare the brief. This court granted the motion and directed counsel to file his brief by August 9, 2023. Counsel timely filed the brief. Thereafter, the State moved for additional time to file its responsive brief on August 28, 2023, and again on September 14, 2023. Both requests were granted, and the State's brief was filed on September 29, 2023. On September 14, 2023, the case was placed on this panel's October 24, 2023, docket.

¶ 48    This court cannot properly review a cause and render a decision until we are fully briefed on the issues and arguments of the parties. *In re Chance H*., 2019 IL App (1st) 180053, ¶ 35. The briefing was not completed until September 29, 2023, well after the 150 days expired. Accordingly, we find good cause for issuing our decision after the 150-day time limit.

¶ 49    Turning to the merits, Joseph raises no direct argument as to the trial court's finding of unfitness or its termination of his parental rights. Instead, Joseph argues that his trial counsel provided ineffective assistance setting forth three arguments in support thereof. In a proceeding to terminate parental rights, a parent has a statutory, as opposed to a constitutional, right to counsel. *In re Br. M*., 2021 IL 125969, ¶ 41. The statutory right to effective assistance from that counsel under the Juvenile Court Act is implied. *Id*. ¶ 42.

¶ 50    A claim of ineffective assistance of counsel is reviewed under the *Stickland v. Washington*, 466 U.S. 668 (1984), standard. Illinois courts apply the same standard utilized in criminal cases to determine a parent's claim of ineffective assistance of counsel under the Juvenile Court Act. *In re A.J*., 323 Ill. App. 3d 607, 611 (2001). The *Strickland* standard consists of two prongs. *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10. Failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Simpson,* 2015 IL 116512, ¶ 35.

¶ 51    The first prong requires a respondent to show that his counsel's performance fell below an objective standard of reasonableness. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 37. As such, the parent must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Trial strategy includes decisions such as when, and to what, matters an objection should be made (*People v. Ramsey*, 2017 IL App (1st) 160977, ¶ 36) as well as decisions regarding what evidence to present and whether or not to call witnesses (*People v. West*, 187 Ill. 2d 418, 432 (1999)).

17

Judicial review of counsel's performance is highly deferential. *McGath*, 2017 IL App (4th) 150608, ¶ 38.

¶ 52 The second prong of the *Strickland* standard requires the respondent to show that, but for counsel's errors, there is a reasonable probability that the result of the proceedings would have been different. *People v. Houston*, 229 Ill. 2d 1, 4 (2008). A reasonable probability is defined as a probability that undermines confidence in the outcome of the trial. *Id.*

¶ 53 Joseph's first issue on appeal contends that his trial counsel was ineffective for failing to assert his fifth amendment privilege against self-incrimination on the basis that his testimony about having committed prior felonies could be used against him in future prosecutions which have, as an element thereof, the commission of a prior felony. Ultimately, however, Joseph concedes that his counsel's failure to assert the privilege would not prevent the criminal convictions from being used against Joseph in any future proceeding. The State agrees, arguing that Joseph's testimony could not further incriminate him as the convictions are a matter of public record.

¶ 54 "The fifth amendment to the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.' " *In re A.W.*, 231 Ill. 2d 92, 106 (2008) (quoting U.S. Const., amend. V). "The fifth amendment privilege against self-incrimination gives a person the right to refuse to testify against himself or herself when the person is a defendant in a criminal trial, or any other civil or criminal proceeding when the testimony may incriminate the person in future criminal proceedings." *Id.* (citing *Allen v. Illinois*, 478 U.S. 364, 368 (1986)). "[T]he fifth amendment right against self-incrimination applies to juvenile proceedings." *Id.* at 107. However, "a witness may exercise his right to avoid self-incrimination only where he has reasonable cause to suspect the possibility of a subsequent prosecution from a direct answer." *People v. McNeal*, 301 Ill. App. 3d 889, 892 (1998). "The privilege against self-incrimination must

18

be liberally construed in favor of the accused or the witness." *Id.* at 893. However, the privilege may be denied "when it is perfectly clear, from a careful consideration of all the circumstances in the case, that the answers sought cannot possibly have [a] tendency to incriminate." (Internal quotation marks omitted.) *Id.*

¶ 55    Here, Joseph points to no circumstance in which any answer provided by his testimony would have a tendency to incriminate him. Joseph's testimony related solely to the dates of his prior convictions, which are a matter of public record. Joseph points to no pending criminal proceeding in which the testimony in this case would further incriminate Joseph. Nor do we believe such testimony could incriminate Joseph when "prior convictions are 'highly verifiable matters of record.' " *People v. Watson*, 322 Ill. App. 3d 164, 167 (2001) (quoting *United States v. Forbes*, 16 F.3d 1294, 1299 (1st Cir. 1994)). As Joseph provides no argument to the contrary, we find that his claim that his trial counsel was ineffective for failing to assert Joseph's fifth amendment right when questioned about his past convictions fails to show deficient performance by counsel. No argument claiming prejudice was presented.

¶ 56    Joseph's second issue contends his trial counsel was ineffective for making no meaningful effort to rebut the presumption of depravity. In support, Joseph argues that his counsel failed to call any witness or present any evidence at the hearing. He further argues that counsel could have argued that Joseph's completion of his sentences from the prior convictions was evidence of rehabilitation.

¶ 57    Depravity is defined as "an inherent deficiency of moral sense and rectitude." *Stalder v. Stone*, 412 Ill. 488, 498 (1952). The Adoption Act does not provide a specific number of felony convictions that equate to an irrebuttable finding of depravity. The "[d]epravity of a parent may be shown by a series of acts or a course of conduct that indicates a moral deficiency and an inability

19

to conform to accepted morality." *In re Dawn H.*, 281 Ill. App. 3d 746, 757 (1996). Generally, a single felony is insufficient to establish depravity in a parent. *Id.*; see also *In re R.G.*, 165 Ill. App. 3d 112, 134 (1988). However, in some circumstances, one felony will suffice. See *In re Abdullah*, 85 Ill. 2d 300, 306-07 (1981); see also 750 ILCS 50/1(D)(i) (West 2022). Instead, the Adoption Act provides a rebuttable presumption of depravity "if the parent has been criminally convicted of at least 3 felonies" with at least one of the convictions taking "place within 5 years of the filing of the petition or motion seeking termination of parental rights." 750 ILCS 50/1(D)(i) (West 2022). The presumption is rebutted by "clear and convincing evidence" that respondent is not depraved. *Id.*

¶ 58    While Joseph contends his counsel should have presented witnesses or submitted evidence to rebut the presumption of depravity, no witness was named, and no evidence was identified that could have been presented. "[T]here can be no substantial showing of ineffective assistance of counsel for failure to investigate or call a witness if there is no evidence that the exculpatory evidence actually exists." *People v. Dupree*, 2018 IL 122307, ¶ 37. Because Joseph identifies no specific piece of exculpatory evidence that would rebut the presumption of depravity, we cannot find that Joseph's counsel was deficient in failing to present the unnamed evidence or witness.

¶ 59    Nor do we find that counsel was deficient in failing to argue that Joseph was rehabilitated by serving the sentences associated with his prior convictions. Trial counsel's decision as to what to argue in closing argument is trial strategy. *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 83 (citing *People v. Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 15). Here, instead of focusing on Joseph's sentences for his prior convictions—which would place additional focus on Joseph's prior convictions for violation of an order of protection, child pornography, and his sex offender status—counsel focused his argument on the lack of evidence showing that Joseph would not be a

20

good father and Joseph's attempts to reunite with his daughter, both of which focused more positively on Joseph. Joseph provides no argument as to why counsel's trial strategy to focus on the positive, rather than the negative, in his closing argument, was evidence of deficient performance. Given the lack of evidence and argument on this issue, we find that Joseph failed to prove deficient performance by his trial counsel.

¶ 60    Finally, Joseph's contends that his trial counsel was ineffective for failing to argue that his testimony provided an insufficient basis to make a finding of depravity. We find this argument completely without merit.

¶ 61    First, trial counsel argued that "the State did not meet their burden" of proof. Such statement would encompass the element of whether one of Joseph's prior convictions fell within the requisite five-year period. Second, Joseph's contention that his testimony failed to provide the necessary information is equally erroneous. Joseph admitted that one of his felonies was for unlawful residency of a child sex offender at the fitness hearing. When asked if this conviction occurred on November 19, 2020, Joseph replied, "I guess so. I don't know." While this response was not definite, it did not deny the underlying facts premised in the question.

¶ 62    Regardless of Joseph's less than clear response provided at the fitness hearing, his argument ignores his testimony at the permanency hearing on January 21, 2021. At that time, the parties were attempting to determine the basis of Joseph's most recent conviction and whether a sex offender assessment was performed prior to sentencing. The court clarified that Joseph's conviction "was based on child sex offender residing 500 feet within a park" for which he received probation in November 2018. After failing to adhere to the conditions of probation, Joseph's probation was revoked, which led to his three-year sentence in IDOC. When the court asked Joseph if it got that wrong, Joseph replied, "Nope." As such, Joseph's January 21, 2021, admission that

21

his conviction for unlawful residency of a child sex offender occurred in November 2018 provided the information necessary to determine whether the conviction was within five years of the State's petition to terminate parental rights. The petition was filed on April 1, 2022, and Joseph's testimony confirmed the elements necessary for invocation of the presumption. Accordingly, neither deficient performance by Joseph's trial counsel, nor prejudice to Joseph, can be shown.

¶ 63    Joseph's contentions alleging that his trial counsel provided ineffective assistance have no merit. Accordingly, we affirm the circuit court's finding of unfitness and order terminating Joseph's parental rights.

¶ 64                                III. CONCLUSION

¶ 65    For the reasons stated herein, we affirm the circuit court's finding of unfitness and order terminating Joseph's parental rights.

¶ 66    Affirmed.