2024 IL App (1st) 211257-U

No. 1-21-1257

Order filed June 28, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 16730 |
| | ) | |
| PARTA HUFF, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE JOHNSON delivered the judgment of the court.
Justices Hyman and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We reject defendant's claims of ineffective assistance of trial counsel where they are inadequately developed for appellate review, rely on materials that are *dehors* the record, fail to satisfy the deficient-performance prong of *Strickland* analysis, or involve non-final judgments.

¶ 2    Following a bench trial, defendant Parta Huff was found guilty of aggravated battery to a peace officer causing great bodily harm (720 ILCS 5/12-3.05(a)(3)(i) (West 2016)) and aggravated battery to a peace officer (720 ILCS 5/12-3.05(d)(4)(i) (West 2016)). The trial court sentenced

defendant to consecutive terms of 15 and 5 years in prison, respectively. On appeal, defendant contends that he received ineffective assistance of trial counsel where his attorneys failed to adequately challenge the State's case.[1] For the reasons that follow, we affirm.

¶ 3    Defendant's convictions arose from the events of October 5, 2016, when he drove a car into the doorway of a liquor store and then engaged in a physical struggle with multiple police officers who responded to the scene. Following arrest, defendant was charged in a 25-count indictment with, *inter alia*, the attempted first degree murder of and aggravated battery causing great bodily harm to Chicago police officer Veronica Murillo, the aggravated battery of Chicago police officer George Moussa, and resisting or obstructing both officers. The State proceeded to trial on eight of the counts, nol-prossing the rest.

¶ 4    At trial, Officer Moussa testified that around 10:30 a.m. on the day in question, he and his partner, Murillo, were on patrol in uniform in a marked car when they were flagged down by a pedestrian who reported that a car had just "crashed into" a nearby building. Moussa made a U-turn and drove to the location, where he saw the car. Two Cook County sheriffs who were on scene pointed at a man who was walking away from the car and said, "[T]hat's him." In court, Moussa identified defendant as the man walking away from the scene.

¶ 5    Moussa pulled up alongside defendant and asked him to stop. Defendant kept walking, so Moussa exited his car and asked him what was going on and why he was leaving the scene. Defendant did not respond. Moussa noticed that defendant's pupils were dilated so that his eyes looked "all black." Based on his experience as a police officer, Moussa suspected defendant was

_____

[1]Two attorneys represented defendant at trial. For clarity, *infra*, we will refer to trial counsel in the singular in our analysis.

under the influence of a narcotic, specifically, phencyclidine (PCP). Defendant was over six feet tall and weighed over 200 pounds.

¶ 6    Moussa and Murillo, who had also exited the car, approached defendant. Murillo attempted to handcuff him. She cuffed one wrist but, as Moussa and Murillo tried to turn defendant around to cuff the other wrist, he pulled away and continued to struggle as they moved him toward their car. Moussa was concerned that if defendant broke free, he would be able to use the handcuffs as a weapon against them. In an attempt to gain defendant's compliance, Moussa pulled out his Taser and discharged it. The cartridge missed defendant. Moussa discharged the Taser a second time. Both of its prongs struck defendant in the chest, but defendant pulled one prong out.

¶ 7    After radioing for backup, Moussa attempted to conduct a "dry stun," which he explained would complete the circuit of the prong defendant had not removed from his body. Defendant did not respond to the dry stun. Instead, he "got more irritated and started resisting more." Moussa and Murillo went "hands on" and the struggle turned into a fight. Defendant rolled to the side of the car, took hold of Murillo's hair, and punched her in the face multiple times with a closed fist. When Moussa stepped in between them, defendant hit Moussa's ear, which caused him to black out momentarily. Moussa then grabbed defendant and struck him in the face a "couple" of times with a closed fist. Defendant turned Murillo and body-slammed her to the street, landing on top of her. Moussa ended up on top of both of them on the ground.

¶ 8    Defendant held Murillo's hair in both hands and attempted to "hit her head off the ground and slam it back on the ground." He also attempted to gouge her eyes with his thumbs. Moussa slid farther on top of defendant and Murillo in an attempt to stop defendant. He also deployed an entire can of oleoresin capsicum "canister spray," but it had no effect on defendant. Around this

time, other officers arrived at the scene and assisted in restraining defendant and removing him from Murillo. Until they arrived, defendant had control of Murillo's head. The newly-arrived officers, among other things, punched and kicked defendant. For the first time during the incident, defendant made a noise, which Moussa described as "like a squealing pig." Eventually, defendant was restrained and Murillo was able to get up off the ground.

¶ 9     As a result of the incident, Moussa sustained a "knee and a quad injury" and had torn ligaments in his right hand. He was off work for around four months.

¶ 10     Moussa testified that his car's dashboard camera captured some of the incident on video. He had reviewed the video in its entirety and agreed it truly and accurately showed the events of the morning in question. The State entered into evidence as exhibits both the full video, which was about 1 hour and 18 minutes long, and a clip of the video, which was about 5 minutes and 20 seconds long. The State published the clip in court.

¶ 11     The video, which is included in the record on appeal and this court has reviewed, shows Moussa and Murillo arriving at the scene and pulling up alongside defendant, who is walking on the sidewalk. As he stops the car, Moussa says, "Come here, man." Defendant does not respond. After a pause, Moussa repeats, "Come here." Moussa then walks into the frame of the video as he says, "Hey, I ain't playing with you dude. I'm going to tase you in like two seconds. I ain't f*** around with you." Murillo and Moussa approach defendant on the sidewalk and direct him to put his hands behind his back. They each take one of defendant's arms and attempt to move them behind his back. Defendant does not comply. As they struggle, the group moves off camera. The officers continue to direct defendant to put his arms behind his back and Murillo says, "Tase him."

¶ 12    Murillo moves back into view of the camera, holding defendant's left hand, which is cuffed, on the hood of the car. She repeats her direction to Moussa to deploy his Taser several times. The officers repeatedly tell defendant to "drop," "get down on the ground," and "stop fighting." Then, as she pulls defendant's arm further toward the middle of the hood and defendant pulls against the cuff, Murillo says, "Ride him." Moussa enters the frame and deploys his Taser on defendant's neck. Moussa, Murillo, and defendant struggle and move off camera.

¶ 13    When the three re-enter the camera's view two to three seconds later, further from the car, defendant punches Murillo and falls to the ground with her. Multiple officers who have arrived at the scene surround defendant and Murillo, obstructing the camera's view of them, and join the struggle. Someone repeatedly says, "Let her go." Various officers pull at defendant's legs, punch him, kick him, and knee him. Approximately two minutes and ten seconds after falling to the ground, Murillo emerges from the crowd and stands up. She ties her hair back, kneels down on the pavement, puts her hands to the ground, and then is obscured from view behind the group. Eventually, officers carry defendant away.

¶ 14    On cross-examination, Moussa agreed that, when he arrived on the scene, the sheriffs pointed defendant out but did not say that he had any weapons on him or that he was a danger to anyone. He also agreed that he did not see any weapons on defendant and that defendant did not approach him aggressively. Moussa agreed that, on the video, he said to defendant, "Come here, man, come here. I'm not playing you. I'm going to taser you in two seconds," but clarified that he had first told defendant to come over to his car. He also agreed that, on the video, after Murillo placed one handcuff on defendant, she said, "Taser, taser, taser." Moussa explained that she was telling him to tase defendant because he was resisting and not letting them put his other hand

behind his back for cuffing. He further stated that he kept deploying the Taser because he was trying to complete the circuit and gain defendant's compliance.

¶ 15    Officer Murillo testified that she and Moussa responded to a report that someone had abandoned a car in the entrance of a liquor store. When they arrived at the given location, Cook County Sheriff's officers pointed out defendant, whom the parties stipulated Murillo would identify in open court. Murillo and Moussa attempted to place defendant under arrest, but he "was very violent and uncooperative." Murillo managed to place one cuff on defendant but, because defendant was violent and aggressive, she was not able to cuff his other hand. She hung on to the cuffs with both her hands so that defendant could not use them to strike her or anyone else. When Murillo saw defendant moving his cuffed hand in such a way that she was afraid he would "slide out," she told Moussa to "ride him." In court, she explained that by saying this, she was telling Moussa to continue tasing defendant.

¶ 16    Murillo testified that although Moussa deployed his Taser, it had no effect on defendant. Murillo tried to keep defendant in front of the squad car so that the dashboard camera would record the incident, but defendant pulled her to the side. He stared "intently" at her jaw and temple and then repeatedly struck her jaw, mouth, and temple. In court, she stated that she could not remember what Moussa did at this point. Defendant grabbed Murillo's hair, wrapped it around his hand, and twisted and ripped it out. He leaned in and threw her face-down onto the ground. The front of her head hit the ground first. Defendant, whose hand was still in her hair, smashed her head into the cement "over and over."

¶ 17    As a result of the incident, Murillo was hospitalized for approximately four and a half weeks. She testified that she sustained a traumatic brain injury. Among other things, that injury

caused problems with balance that required her to use a walker or cane. She had problems with her vision, including high sensitivity to light and impaired depth perception. She also was in pain "at a high level at all times," experienced blackouts, could not control her emotions, and suffered cognitive impairments, such as having "a delay in understanding certain things" and not being able to recall the correct name for familiar objects. Murillo was placed on permanent disability and had a 24-hour caregiver. At the time of her testimony, she was still learning skills to manage her situation, as neurologists had told her there was no cure for her symptoms.

¶ 18    On cross-examination, Murillo stated that she did not remember whether she engaged her body camera during the incident with defendant. When she first saw defendant, he was walking on the sidewalk. She recalled that Moussa called out to defendant but did not remember what words he used. She stated that, prior to handcuffing defendant, she tried to deescalate the situation by telling him to stop resisting. When asked whether, during the incident, she moved over to the squad car, she answered, "Yes, when I pulled him in front of the camera."

¶ 19    Dr. Adam Hutton, a chiropractor who treated Murillo for over a year, testified as an expert in the field of neurological rehabilitation. At intake, Murillo complained of headaches, neck pain, back pain, mental dullness, loss of memory, dizziness, ringing and buzzing ears, cold hands and feet, numbness in the legs, eyestrain pain, bilateral shoulder pain, confusion, imbalance, blurred vision, irritability, "pins and needles" in her legs, and the inability to walk without a cane or walker. Hutton testified that Murillo's symptoms were consistent with someone who had experienced blunt force trauma to the head, and that she displayed all 16 common symptoms of traumatic brain injury. He opined that she had suffered a "coup contrecoupe" injury, that is, an injury where, due to a considerable amount of force upon impact, the brain hits the inside of the skull, causing contusions,

bruises, swelling, vessel tearing, and axonal shearing. She also suffered from Post-Traumatic Stress Disorder (PTSD) and could not drive due to dizziness and nystagmus in the eyes. Hutton testified that Murillo suffered permanent damage and would be disabled for life.

¶ 20    Hutton's treatment for Murillo, which consisted of physical therapy, balance exercises, and spine treatment, helped her manage her symptoms temporarily. He performed a digital motion x-ray on Murillo, which he explained "captures more injuries, the things that are missed on a standard MRI or a CAT scan." The x-ray revealed "25 to 28 percent whole body impairment," which he likened to "cutting off a leg." He opined that several of the ligaments in Murillo's neck were permanently overstretched or torn as a result of the blunt force trauma to her head. In layman's terms, he summarized that "There's a whole lot of permanent damage which will never be fixed." He also stated that Murillo's injuries could have not been the result of a single concussion she suffered playing hockey sometime prior to the incident, or a result of her pre-existing bulging discs and degenerative disc disease.

¶ 21    Garland Eleby testified that around 10:30 a.m. on October 5, 2016, while he was working as a security guard in the parking lot of a business at the intersection of Cicero Avenue and Roosevelt Road, he saw a slow-moving car drive into the front door of a liquor store across the street. After some other cars passed, Eleby saw a man dressed in red by the driver's side of the crashed car, signaling to Cook County sheriffs who were driving in a patrol car nearby. In court, Eleby identified defendant as the man in red. Eleby left his post to go inside and notify his boss of the incident.

¶ 22    When Eleby came back outside two or three minutes later, he saw a Chicago police car parked across the street and two uniformed officers, one male and one female, who had defendant

"kind of tightened up." The officers were saying "stop resisting, I'm going to tase you, get down, things of that nature." Defendant and the officers "got to tussling" in front of the police car. Defendant punched the female officer in the face and they both fell to the ground. Then, the male officer "jumped on top trying to tase him, punching him, doing everything to *** get the suspect under control."

¶ 23    Eleby testified that defendant got on top of the female officer and started "pounding" her head on the pavement while holding her hair. Another officer arrived, grabbed defendant's leg, and tried to pull him off the female officer while yelling, "Let her hair go." Additional officers arrived to assist and, "afterwards," defendant "let out some type of wail, like some type of cry." Eventually, defendant was secured and placed under arrest. The female officer was put on a stretcher and loaded into an ambulance.

¶ 24    Chicago police detective Jerome Warner testified that he was in his police car when he heard Moussa's radio call that he had deployed a Taser. Because Moussa sounded "in distress" and was only four blocks away, Warner activated his body camera and immediately drove to the location. There, he saw a man in red clothing, whom he identified in court as defendant, stretched out on the street and Moussa trying to push him off someone. Warner ran up, grabbed defendant's foot, and pulled him "somewhat" off the other person on the ground, whom he could see was a female police officer. Defendant's hands were entangled in her hair and he was picking her head up and "grinding" her face into the street. Warner used "all [his] strength" to try to get defendant off the officer and punched him in the face three times, but defendant did not react.

¶ 25    Warner repeatedly screamed, "Let her go," while Moussa tried to use his Taser on defendant, to no effect. Warner was hit with the Taser and received a "jolt," but was not

incapacitated. The female officer said, "He's got me by the hair," at which point Warner recognized her as Murillo. At some point, Warner called for backup. After several more officers arrived, they were able to get defendant off Murillo and handcuff him. While he was being restrained, he made a "loud squeal." Warner saw Murillo kneeling on the ground before she was assisted to an ambulance and transported to the hospital. Later, Warner learned that another officer had deployed a Taser against defendant during the incident.

¶ 26    The State published a clip of the video captured by Warner's body camera. The video, which this court has reviewed, depicts Warner arriving on scene, pulling on defendant's leg, and repeatedly saying, "Let her go" and, "Let go of her." As defendant and multiple officers struggle, someone deploys a Taser on defendant's neck and Warner removes defendant's hand from Murillo's hair. Defendant makes a shrieking noise, after which the camera moves so that defendant's face can be seen in the corner of the frame. Blood drips from his mouth. Eventually, officers handcuff defendant.

¶ 27    On cross-examination, Warner agreed that, by the end of the incident, about 15 officers were at the scene. He agreed that his body camera's video captured the sound of a Taser, depicted some of the officers administering "knee strikes" to defendant's face, and showed blood coming out of defendant's mouth and nose.

¶ 28    The parties stipulated that, if called as a witness, Carmen Martinez would have testified that, on the date in question, she was working as a manager at the liquor store. Shortly after 10 a.m., she heard a loud boom at the front of the store. After observing a car that had jumped the curb, hit the front doors, and cracked them open, she went outside. There, she saw defendant, whom she would have identified in court, alone in the car in the driver's seat. Martinez asked

defendant if he was okay but received no response. He exited the car and began walking away. Martinez called 911. She then saw two Cook County sheriffs driving by, heard them ask defendant questions, and noted that defendant did not respond.

¶ 29    Next, Martinez saw a Chicago police car with its lights and sirens activated pull up alongside defendant. A male officer and a female officer exited the squad car and approached defendant. He pushed away, and they "ended up" in front of the police car. Defendant punched the female officer in the face with closed fists. He grabbed her hair and threw her to the ground. Then, while on top of her, he continued punching her in the face. He pinned her on the ground, "and had her by the hair and wouldn't let go." The male officer tased defendant but then dropped the Taser on the ground. Defendant continued to fight with the police after he was tased. Several more officers arrived at the scene and eventually they were able to place defendant under arrest.

¶ 30    The parties stipulated to the testimony of a nurse who collected blood and urine from defendant on the day of the incident, the chain of custody of the samples, and the testimony of a forensic chemist that defendant's urine sample tested positive for PCP.

¶ 31    Forest Park police officer Young Lee testified regarding an incident that occurred several months earlier, on April 1, 2016, for the limited purpose of showing intent, absence of mistake, and lack of an innocent frame of mind. On that date, Lee saw defendant, whom he identified in court, run a stop sign and, shortly thereafter, improperly change lanes. Lee activated his lights and followed for over a block. Once defendant pulled over, Lee approached on foot, asked for his license and proof of insurance, and advised him of the traffic violations he had committed. Defendant, who had lowered his window only about two inches, was "irritated and [a] little bit

argumentative," but eventually placed his license up against the window. Despite repeated requests, defendant refused to hand Lee his license or exit his car.

¶ 32    When Lee advised defendant that he was under arrest, defendant "took off," and Lee followed in his car. Defendant ran several stop signs, drove the wrong way on a one-way street, "T-boned" another car, and continued driving until his car became disabled and stopped. After a short foot chase, Lee caught up with defendant and attempted to place him into custody. Defendant pulled and shoved Lee, causing him to fall and injure his knee and arm. Again, defendant ran and Lee pursued him on foot. Lee deployed his Taser. Both probes struck defendant, who fell to the ground. However, the probes disconnected and defendant got up. Lee tried to take defendant to the ground, but defendant pulled, pushed, shoved, and struggled against Lee. They struggled for several minutes before another officer arrived and defendant was taken into custody. Lee suffered a torn labrum and a torn bicep, had surgery, and was off work for a few months.

¶ 33    Defendant made a motion for a directed finding, which the trial court denied. Defendant then presented the parties' stipulation that an investigator from the public defender's office, if called as a witness, would have testified that he photographed defendant and his injuries two days after his arrest. Defendant entered those photographs into evidence as exhibits.

¶ 34    Following arguments, the trial court found defendant not guilty of the attempted murder of Murillo, but guilty of aggravated battery causing great bodily harm to Murillo (counts IV and V), aggravated battery causing bodily harm to Moussa (counts XII and XIV), and resisting or obstructing both officers (counts XXII and XXIII). Defendant filed a posttrial motion, which the trial court denied. At sentencing, the trial court imposed consecutive terms of 15 and 5 years in prison on count IV (aggravated battery causing great bodily harm to Murillo) and count XII

(aggravated battery causing bodily harm to Moussa), respectively, and merged the remaining guilty findings. Defendant filed a motion to reconsider sentence, which the trial court denied. Defendant filed a timely notice of appeal.

¶ 35    On appeal, defendant contends that he received ineffective assistance of trial counsel.

¶ 36    Every defendant has a constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const.1970, art. I, § 8. Claims of ineffectiveness are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668, (1984). See *People v. Albanese*, 104 Ill. 2d 504 (1984). To establish a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687. More specifically, a defendant must demonstrate that his counsel's performance was objectively unreasonable under prevailing professional norms (*id.* at 694), overcome a "strong presumption" that counsel's alleged error was part of a "sound trial strategy" (*People v. Houston*, 226 Ill. 2d 135, 144 (2007)), and establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*Strickland*, 466 U.S. at 694).

¶ 37    In reviewing claims of ineffective assistance of counsel, appellate courts "use a bifurcated standard of review, wherein we defer to the trial court's findings of fact unless they are against the manifest weight of the evidence, but make a *de novo* assessment of the ultimate legal issue of whether counsel's actions support an ineffective assistance claim." *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008). In this case, where defendant is not challenging any findings of fact made by the trial court but, rather, is claiming that the trial court should have been presented with certain

evidence and arguments, we consider *de novo* whether defendant has stated a claim for ineffective assistance of counsel. *People v. Ortega*, 2020 IL App (1st) 162516, ¶ 24.

¶ 38    Defendant contends that his trial counsel was ineffective for failing to adequately challenge the State's case against him. Defendant asserts that his trial attorneys "did not seem to have a theory of the case," and that the "closest they came to a theory was arguing that the injuries suffered by the officers did not cause *great* bodily harm." (Emphasis in original.) He argues that the attorneys "seemed to hope" that, when the trial court watched the videos that were entered into evidence, it would interpret them in favor of the defense "without the defense even having to point out errors in the prosecution's interpretation or by offering its own snippets of the dash cam and body cam as well as other items tendered in discovery to push the judge toward the defense view of the case."

¶ 39    More specifically, defendant argues that his attorneys were ineffective for failing to: offer case law to support a claim that aggravated battery causing great bodily harm is a specific intent crime; "adequately explore the mental state of aggravated battery causing great bodily harm"; "explore the mental state of battery itself" where "defendant did not even make contact with the officers"; highlight parts of the "State's video" that showed that "the arrest *** was not a battery," that he lacked "intentional or knowing intent" to commit battery, and that there was "unlikely great bodily harm"; reasonably analyze the videos in evidence; and tender exculpatory discovery showing that all of the State's eyewitnesses "were lying about or greatly exaggerating what occurred."

¶ 40    Defendant also argues that his attorneys were ineffective for failing to: play footage from the dashboard camera showing that "the *first* thing Moussa did when he walked over to the

- 14 -

defendant was put his Taser against defendant's neck" (emphasis in original); play the portion of the dashcam video showing Murillo holding him on the hood of the squad car at the same time Moussa ordered him to get on the ground and "address th[is] fact"; play footage showing that Murillo injured herself making a diving tackle of him; and highlight footage showing Murillo standing and fixing her hair while other officers beat and tased him.

¶ 41    Further, defendant argues that his attorneys were ineffective for failing to: create significant doubt as to the credibility of the State's eyewitnesses by showing "snippets of body worn camera footage tendered to it by the State in discovery" and by using Murillo's medical records; impeach Hutton with Murillo's medical records; address the "part of the incident" where Murillo "tackled" him and "bloodied her nose and was concussed when she hit the pavement"; offer evidence available via a "five minute Google search" showing that numerous prestigious medical centers have concluded MRIs and CT scans identify brain trauma and spinal injuries more accurately than x-rays; and address the fact that Murillo held defendant's cuffed hand on the hood of the car while both she and Moussa ordered him to get down on the ground.

¶ 42    Defendant maintains that had counsel provided effective assistance, "it was reasonably likely he would have prevailed on all counts." He further concludes that the failure of his attorneys to effectively cross-examine the State's evidence and/or offer their own evidence left him without an effective defense and "thus prejudiced him greatly."

¶ 43    As an initial matter, we address the State's argument that defendant forfeited certain claims by failing to adequately develop them in his brief.

¶ 44    Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires that an appellant's brief contain reasoned contentions. We are entitled, as a reviewing court, to have the issues on appeal

clearly defined, pertinent authority cited, and a cohesive legal argument presented. *Lewis v. Heartland Food Corp.*, 2014 IL App (1st) 123303, ¶ 5. "An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule." *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010). As such, an issue that is not clearly defined and sufficiently presented is forfeited. *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 33.

¶ 45 The first argument the State has identified as inadequately developed in defendant's brief is the assertion that counsel was ineffective for failing to rebut the video evidence offered by the State at trial. We agree with the State that, where defendant does not specify which video he is referring to or explain how counsel could have rebutted such a video, the argument is insufficiently presented to be considered on appeal. See *People v. Nere*, 2018 IL 122566, ¶ 25 (a reviewing court must confine its analysis to issues that are sufficiently developed by the appellant).

¶ 46 Second, the State notes defendant's argument that trial counsel was ineffective for failing to "offer exculpatory evidence in the record." We agree with the State that this argument is insufficiently developed for review. As the State observes, defendant does not identify what evidence in the record he believes counsel should have offered. We cannot find an attorney ineffective for failing to offer exculpatory evidence if the appellant has identified no specific piece of exculpatory evidence or if there is no evidence that the exculpatory evidence actually exists. See *People v. Dupree*, 2018 IL 122307, ¶ 37; see also *In re B.C.*, 2023 IL App (5th) 220664-U, ¶ 58; Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 47    Third, the State notes defendant's argument that counsel was ineffective in failing to effectively cross-examine the State's evidence. Again, this argument is inadequately developed. Defendant does not specify which witnesses his cross-examination argument pertains to or how counsel's cross-examination of those witnesses was deficient. In addition, even if defendant had included some specificity in his argument, in general, the decision whether or not to cross-examine or impeach a witness, as well as the manner in which to do so, are matters of trial strategy which will not support a claim of ineffective assistance of counsel. *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997).

¶ 48    Fourth, the State notes defendant's arguments that counsel was ineffective in failing to reasonably analyze the videos in evidence, explore the mental state of battery, and adequately explore the mental state of aggravated battery. Defendant does not explain what sort of examination of the videos he believes would have constituted a reasonable analysis or what it would mean to "explore" a mental state of a crime during trial. We agree with the State that these arguments are insufficiently developed for review. See *Nere*, 2018 IL 122566, ¶ 25.

¶ 49    Fifth, the State highlights defendant's argument that counsel "did not seem to have a theory of the case." Again, defendant has not fleshed out this argument. It is insufficiently developed for consideration on appeal. See *id.*

¶ 50    Finally, the State notes defendant's argument that counsel was ineffective for failing to tender exculpatory discovery showing that all of the State's eyewitnesses were lying about or greatly exaggerating what occurred at the scene. Defendant has not identified what materials he believes counsel failed to tender during discovery, rendering it unclear what he alleges counsel did

not do. Once again, we agree with the State that the argument is forfeited due to inadequate development. See *id.*

¶ 51    Next, we address the State's argument that this court should decline to adjudicate the claims that defendant has made based on extra-record evidence, specifically, still shots taken from body camera footage and excerpts from Murillo's medical records. In his brief, defendant argues that counsel was ineffective in failing to introduce these items, which he asserts were tendered by the State in discovery, and failing to use them to impeach Hutton. Defendant has appended the still shots and medical records to his brief. However, these materials are not in the record on appeal.

¶ 52    An appellant who brings a claim of ineffective assistance of counsel on direct appeal must proceed on the trial record, even if it is incomplete or inadequate to support the claim. *People v. Bew*, 228 Ill. 2d 122, 134 (2008). Where the record is insufficient for litigating a claim of ineffectiveness, such a claim should be brought on collateral review rather than on direct appeal. *People v. Ligon*, 239 Ill. 2d 94, 105 (2010).

¶ 53    Here, defendant is making claims based on materials that are *dehors* the record. As such, the claims are unsuitable for resolution on direct appeal. *Id.* Moreover, because parties may not use briefs and appendices to supplement the record, we ignore the improperly appended documents. *In re Parentage of Melton*, 321 Ill. App. 3d 823, 826 (2001). Defendant may raise his claims in a collateral proceeding. See *Bew*, 228 Ill. 2d at 135.

¶ 54    We turn to defendant's remaining arguments.

¶ 55    Defendant argues that trial counsel was ineffective for failing to offer case law to support a claim that "aggravated battery causing great bodily harm is a specific intent crime." He suggests

that counsel could have offered two cases: *People v. Tross*, 281 Ill. App. 3d 146, 150 (1996), and *People v. Russell*, 234 Ill. App. 3d 684, 688 (1992).

¶ 56　In *Russell*, this court quoted the version of the aggravated battery statute that was in effect in 1989, which provided that a person commits aggravated battery if he "intentionally or knowingly" causes great bodily harm or personal disability or disfigurement. *Russell*, 234 Ill. App. 3d at 688 (quoting Ill. Rev. Stat. 1989, ch. 38, par. 12-4(a)). Similarly, in *Tross*, this court recited that aggravated battery is "a specific intent crime," citing the 1994 version of the statute, which set forth that a person commits aggravated battery if he "intentionally or knowingly" causes great bodily harm, permanent disability, or permanent disfigurement. See 720 ILCS 5/12-4 (West 1994); *Tross*, 281 Ill. App. 3d at 150.

¶ 57　However, since the time *Russell* and *Tross* were decided, the statute defining aggravated battery has been amended and renumbered. The statute under which defendant was convicted, section 12-3.05 of the Criminal Code of 2012, specifies that aggravated battery is committed when the defendant acts "knowingly." 720 ILCS 5/12-3.05(a) (West 2016). As such, defense counsel would have been incorrect if he or she had tried to argue a different mental state and cited *Russell* and *Tross* in support. Further, defendant was correctly charged with "knowingly" causing great bodily harm to Murillo (aggravated battery count IV) and bodily harm to Moussa (aggravated battery count XII) and this was a bench trial. Counsel did not need to inform the court of the mental state as the judge in a bench trial is presumed to know the law and apply it correctly. See *People v. Hernandez*, 2012 IL App (1st) 092841, ¶ 41.

¶ 58　Next, defendant argues that counsel was ineffective for failing to publish certain portions of the video recorded by the dashboard camera in Moussa's squad car. However, as defendant

acknowledges, the entire video was admitted into evidence. A video recording may be introduced as substantive evidence if it is authenticated with the testimony of a witness that the recording accurately represents what he or she previously saw or heard. *People v. Dennis*, 2011 IL App (5th) 090346, ¶ 22. So long as a video is authenticated in this way, it need not be published in the courtroom. *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 37.

¶ 59 Here the video was properly authenticated at trial. Moussa testified that he had reviewed the video in its entirety and that it truly and accurately showed the events of the morning in question. As such, there was no need for defense counsel to publish any portions of the video in the courtroom. See *id.* In a bench trial, the court is required to consider all of the evidence. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 69. Here, where the entire video had been admitted into evidence and was required to be considered by the trial court, we cannot find that counsel's failure to publish certain portions of the video in the courtroom was objectively unreasonable. See *Strickland*, 466 U.S. at 687.

¶ 60 Next, defendant argues that counsel was ineffective for failing to offer evidence available via a "five minute Google search" showing that numerous prestigious medical centers have concluded MRIs and CT scans identify brain trauma and spinal injuries more accurately than x-rays. The State responds that this claim is baseless because such a Google search would be inadmissible hearsay. While our research has revealed no Illinois authority on the subject, the State cites *Johnson v. Aramark Correctional Services, LLC*, No. 3:21-CV-P725-JHM, 2024 WL 313643, at *6 (W.D. Ky. Jan. 26, 2024), in which the United States District Court of the Western District of Kentucky held that internet search results, introduced without the testimony of an expert witness to establish the reliability and relevance of the substance of the results, were

unauthenticated hearsay. We agree with this conclusion. As hearsay, such evidence would be inadmissible. See, *e.g.*, *People v. Williams*, 2023 IL App (1st) 192463, ¶ 94 (hearsay is generally inadmissible due to its lack of reliability and the inability of the opposing party to confront the declarant). Because a "[d]efendant's claim of ineffective assistance of counsel cannot be sustained on the basis of counsel's failure to offer inadmissible evidence" (*People v. Denson*, 250 Ill. App. 3d 269, 281 (1993)), defendant's argument fails.

¶ 61   Finally, defendant argues that counsel was ineffective for failing to "address the fact" that Murillo held his handcuffed hand on the hood of the car while she and Moussa ordered him to get down on the ground. This claim involves the charges of resisting or obstructing arrest. However, although the trial court found defendant guilty of two counts of resisting or obstructing arrest, it did not impose a sentence on either of those findings. There is no final judgment in a criminal case absent the imposition of a sentence and, in the absence of a final judgment, an appeal cannot be entertained. *People v. Flores*, 128 Ill. 2d 66, 95 (1989). Here, the trial court imposed sentence on two counts of aggravated battery to a peace officer and merged the guilty findings on the other counts, including the resisting or obstructing arrest counts, into the two sentenced counts. We therefore cannot consider defendant's claims regarding the guilty findings on the resisting or obstructing arrest counts as defendant was not sentenced on those counts. *People v. Patterson*, 2022 IL App (1st) 182542, ¶ 49.

¶ 62   In summary, we reject defendant's claims of ineffective assistance of trial counsel where the arguments are inadequately developed for appellate review, rely on materials that are *dehors* the record, fail to satisfy the deficient-performance prong of *Strickland* analysis, or address non-final judgments.

¶ 63    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 64    Affirmed.